UNITED STATES of America, Plaintiff-Appellee,

v.

David WILLIAMS, Debbie Williams, Wayne Russell, Defendants-Appellants.

Nos. 85–1837, 85–1844 and 85–1858.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 14, 1986.

Decided Aug. 15, 1986.

As Amended Aug. 18, 1986.

Glenn A. Grampp, Lopp, Lopp & Grampp, Evansville, Ind., Philip R. Melangton, Jr., Melangton & Mower, P.A., Indianapolis, Ind., for defendants-appellants.

John J. Thar, Asst. U.S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before CUDAHY, COFFEY and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

David Williams, his wife Debbie Williams, and Wayne Russell are appealing from their convictions for conspiracy to violate drug laws, possession of illegal substances, and unlawful interstate travel. Each raises several issues for our review, and for the reasons stated below we reverse the one count against Debbie Williams. We affirm on all other counts.

## I.

The charges against these appellants arose out of a methamphetamine distribution ring operating in the Evansville, Indiana area. According to the government's version of the facts, the methamphetamine was manufactured by Tim and David Harvey on their South Dakota ranch. Michael Riley and Darrell Ray Stephenson set up the Evansville distribution scheme in early 1981 and began purchasing quantities of the drug from the Harveys for sale in the Evansville area. By early 1982, Riley and Stephenson turned over the leadership of the ring to Michael Marlow and Bobby Dusch. Later that year, Stephenson became an informer for the Drug Enforcement Administration (DEA) and subsequently testified against the appellants at trial. After the Evansville ring eventually

was uncovered by the DEA in 1984, Riley, Dusch, and Marlow, among others, were arrested and charged for their involvement. Each entered into a plea bargain agreement with the government and testified against the appellants at trial.

In the fall of 1981, David Williams was introduced to Michael Riley as a potential assistant in the distribution aspect of the scheme. When Riley turned over his participation in the drug ring to Marlow and Dusch, David Williams was among the customer-distributors he left them. Wayne Russell, who had known Marlow from childhood, apparently became a customer of Marlow and Dusch at about the same time. Bobby Dusch kept books and records of the drug transactions, and according to government exhibits, David Williams and Wayne Russell clearly were listed in those records as having purchased thousands of dollars worth of methamphetamine.

Throughout 1983 and the first half of 1984, David Williams (accompanied at times by Debbie Williams) and Wayne Russell engaged in various drug-related transactions and travels that will be discussed in more detail later in this opinion. During part of this time, the DEA gathered information about the drug scheme through wire interception of telephone conversations. Finally in August 1984, agents of the DEA obtained a warrant to search the Williams' residence and removed from that house some thirty-eight grams of methamphetamine and over $40,000 in cash, along with other items of evidence. At about the same time, the Harveys' South Dakota ranch was searched, revealing a laboratory for manufacturing methamphetamine and over thirteen pounds of the drug. David and Debbie Williams, Wayne Russell, and other members of the drug ring subsequently were arrested and indicted for their involvement.

## II.

### A. Debbie Williams—Count One.

Debbie Williams was charged in Count One with conspiracy to possess and distribute methamphetamine in violation of 21 U.S.C. § 846 and in Count Twelve with interstate travel in violation of 18 U.S.C. § 1952(b)(1). Since she was acquitted of the Travel Act charge, Debbie Williams appeals only her conviction on the conspiracy count. We find that the district court erred in admitting a co-conspirator's statement against her, and that without that statement, there was insufficient evidence to convict her of conspiracy.

### 1. Pre-trial Santiago hearing.

■ A co-conspirator's hearsay statement is admissible against a defendant under Federal Rule of Evidence 801(d)(2)(E) "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy." United States v. Santiago, 582 F.2d 1128, 1134 (7th Cir.1978). The district court must find that the government has established by a preponderance of the non-hearsay evidence that the above elements are present, before the district court can allow the hearsay evidence to be introduced against the defendant. See, e.g., United States v. Shelton, 669 F.2d 446, 465 (7th Cir.), cert. denied, 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982). We have held, however, that once the government proves the existence of the conspiracy, it need present only "slight evidence" to prove that a particular individual was a member thereof. See, e.g., United States v. Gironda, 758 F.2d 1201, 1217 (7th Cir.1985); United States v. West, 670 F.2d 675, 685 (7th Cir.), cert. denied, 457 U.S. 1124, 102 S.Ct. 2944, 73 L.Ed.2d 1340 (1982).

The district court here held a pre-trial "Santiago hearing" to determine the admissibility of the co-conspirator's statement against Debbie Williams. The statement at issue was allegedly made by David Williams to Michael Marlow during a drug transaction at which Debbie Williams was present. Apparently, David Williams told Marlow not to count the money that Marlow had been given in exchange for meth-

amphetamine, because Debbie already had counted it. The non-hearsay evidence introduced at the *Santiago* hearing in support of the admissibility of this statement was as follows. DEA Special Agent McGivney testified that in July 1983, David and Debbie Williams met with Michael Marlow in Colorado Springs and delivered between $22,000 and $24,000 in cash to Marlow. Mr. Thar, the prosecuting attorney, clarified this testimony later in the hearing by stating, "to put it more accurately, Mrs. Williams is present when Mr. Williams hands the money over." Special Agent McGivney also testified that after the transaction, David and Debbie Williams returned to Indiana with Marlow's children. Special Agent Blackketter then testified about the search that was conducted pursuant to warrant in the Williams' house. The search revealed some thirty-eight grams of methamphetamine and approximately $40,020 in cash in the vanity under the bathroom sink. At the conclusion of the hearing, the district judge entered his ruling, over defense objections, that the co-conspirator's statement was admissible against Debbie Williams, based on his finding that "the government has established by a preponderance of independent non-hearsay evidence that there existed a conspiracy and that these defendants were co-conspirators as charged in the indictment."

■ Debbie Williams argues on appeal that the government failed to establish that she was a member of the conspiracy, and therefore that the trial court erred when it admitted the co-conspirator's statement against her. Based on a review of the record we agree, because the record of the *Santiago* hearing reveals that the government did not present even slight evidence that Debbie Williams was a member of the conspiracy. The testimony relating to her involvement demonstrates only that she was associated with a few co-conspirators, most notably her husband, and that she was present during a drug transaction. This court has emphasized several times, however, that mere association with co-conspirators or presence at the scene of an offense or knowledge that something illegal is going on is insufficient to establish membership in a conspiracy under the slight evidence standard. *See, e.g., West,* 670 F.2d at 685; *United States v. Regilio,* 669 F.2d 1169, 1175 (7th Cir.1981); cf. *United States v. Dalzotto,* 603 F.2d 642, 645 (7th Cir.1979). In *West,* for example, this circuit held that the admission of a co-conspirator's statement was error, since the government failed to establish that the declarant was a member of the conspiracy. The case involved a lucrative drug ring known as the "Family" and centered around a drug conspiracy operated by Family members incarcerated in Cook County Jail. One of the defendants, King, was a correctional officer at the jail who allegedly had accepted bribes in return for granting Family members special favors. The government sought to introduce a co-conspirator's statement to the effect that King was "all right" and would arrange for Family members at the jail to be tiered together. Testimony demonstrated that the declarant not only was a Family member, but also was incarcerated in the jail. The court held, however, that this established only the declarant's association with the conspiracy, and that without more, it failed to constitute even slight evidence that the declarant was a member of the conspiracy. 670 F.2d at 679, 685. *See also United States v. Quintana,* 508 F.2d 867, 880–81 (7th Cir.1975) (evidence insufficient to convict defendant of conspiracy where it established only that defendant associated with co-conspirators, was present in vicinity of illegal narcotics, may have possessed heroin, and had the opportunity to join the conspiracy).

In contrast, cases such as *United States v. Regilio* and *United States v. Dalzotto* involve evidence of presence *plus* suspicious circumstances suggesting membership in the conspiracy, and as a result, admissions of co-conspirators' statements were affirmed. In *Regilio,* the record contained evidence of phone calls indicating that the defendant had been notified of drug transactions, apparent reconnaissance efforts of the defendant at the scene of the

crime, and attempts to flee. The reviewing court found the record sufficient to satisfy the slight evidence rule, since it demonstrated "presence, suspicious behavior, and significant prior dealings." 669 F.2d at 1175. Similarly, the record in *Dalzotto* established presence plus suspicious circumstances suggesting membership because of evidence that both the defendant and the declarant "independently pursu[ed] the same ends" and that both had sold drugs to a witness. 603 F.2d at 645.

The government thus could not demonstrate that Debbie Williams was a member of the conspiracy without introducing some evidence that went to more than her association with co-conspirators or presence during conspiracy acts. The only evidence in the record of the *Santiago* hearing that conceivably could go beyond mere presence or association is the testimony regarding the items seized in the Williams' residence. Even this testimony, however, falls short of establishing suspicious circumstances, since it does not suggest that Debbie Williams had any involvement besides possible knowledge of her husband's participation in a drug conspiracy. Her seeming acquiescence in his role in the drug distribution scheme, reprehensible though it is, does not establish that she was a member of the conspiracy. We therefore conclude that the evidence adduced at the *Santiago* hearing failed to provide a basis for the admissibility of the co-conspirator's statement against Debbie Williams.

### 2. *Sufficiency of non-hearsay evidence at trial.*

Our analysis cannot end here, however, because we still must determine whether the government established Debbie Williams' membership in the conspiracy by non-hearsay evidence introduced at trial, or alternatively, whether the error in admitting the co-conspirator's statement was harmless because there was sufficient non-hearsay evidence to find her guilty beyond a reasonable doubt. We find that the answer to both inquiries is negative, since a review of the record demonstrates that the government failed to establish by a preponderance of the evidence (and thus *a fortiori* beyond a reasonable doubt) that Debbie Williams was a member of the conspiracy.

■ The evidence introduced at trial, viewed in the light most favorable to the government, reveals that Debbie Williams had no apparent involvement in the conspiracy other than her presence on certain occasions while her husband engaged in drug transactions. Aside from the evidence elicited during the *Santiago* hearing, the government presented testimony of another trip on which Debbie Williams accompanied her husband and was present while he made a payment for methamphetamine. The government also introduced evidence of additional items seized during the search of the Williams' residence, namely $1,165 in cash and slips of paper containing notations of telephone and room numbers of hotels in which David Williams and Tim Harvey had stayed. Both of these items were seized from Debbie Williams's purse. Finally, a co-conspirator named Donald Ewers testified that he had used cocaine when Debbie Williams was present, although he never saw her use the drug. Ewers did testify that he had witnessed Debbie Williams use marijuana. This evidence does nothing more than establish that Debbie Williams was present during certain drug transactions and may have had knowledge of her husband's involvement in a drug conspiracy. It falls short, however, of demonstrating that she was in any way personally involved as a member of that conspiracy. Moreover, many of the government's witnesses testified that they were unaware of any conspiratorial involvement on the part of Debbie Williams. Thus, there is no evidence that Debbie Williams was guilty of anything more than association with co-conspirators.

It should be noted here that the jury did acquit Mitzi Russell, Wayne Russell's wife, of the same conspiracy charge, and that one might conclude that this demonstrates the jury's capacity not to convict one merely because he or she is associated with a drug dealer. This, however, is not a per-

suasive enough argument for affirmance of Debbie Williams's conviction because the jury's verdict was marred by the evidentiary error discussed above. In the absence of that erroneously admitted evidence, there is simply no basis upon which Debbie Williams could be characterized as a member of the conspiracy. Accordingly, we conclude that no rational trier of fact could have found Debbie Williams guilty of conspiracy beyond a reasonable doubt, and we reverse Debbie Williams's conviction on the grounds of insufficient evidence. *See, e.g., Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1977); *United States v. Mayo,* 721 F.2d 1084, 1087 (7th Cir.1983).

### B. *David Williams and Wayne Russell—Count One.*

David Williams and Wayne Russell ask this court to overturn their convictions on the conspiracy count on the ground that there was a fatal variance between the indictment and the evidence adduced at trial, and that there was insufficient evidence to convict them of the conspiracy as charged. They further claim that the trial court gave the jury an erroneous instruction on the conspiracy count. Finally, David Williams challenges his Count One conviction because it was based in part on evidence gathered during the search of his home, evidence that he claims should have been suppressed. Each of these arguments is without merit.

1. *Variance and sufficiency of evidence.* The Superceding Indictment charged the defendants in the first para-graph of Count One with conspiracy "to knowingly possess with intent to distribute and distribute in the State of Indiana, Methamphetamine, a Schedule II Non-Narcotic Drug Controlled Substance in violation of Title 21, United States Code, Section 841(a)(1)." In seven unnumbered paragraphs following the first paragraph, the indictment alleged more specifically the roles of each of the co-conspirators. Finally, in numbered paragraphs, the indictment alleged various overt acts on the part of the co-conspirators. Williams and Russell claim that the conspiracy charged must be proved to cover all of the material contained in the unnumbered paragraphs. Thus, they argue, the government's failure to prove that their participation involved the same scope or breadth as alleged in the indictment means that there was either a fatal variance or an insufficient quantum of evidence on which the jury could convict.

This circuit has indicated that " '[a] variance occurs when the terms of the indictment are unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment.' " *United States v. Galiffa,* 734 F.2d 306, 312 (7th Cir.1984), *quoted in United States v. Mosley,* 786 F.2d 1330, 1335 (7th Cir.1986). Based on a review of the trial record, we conclude that no variance existed between the indictment and the facts introduced at trial and that the evidence was sufficient to prove Williams and Russell guilty beyond a reasonable doubt.

■ The unnumbered paragraphs of the indictment, which are reproduced below,[1]

---

1. The unnumbered paragraphs alleged the following:

It was part of said conspiracy that defendants and co-conspirators, TIMOTHY HARVEY, DONALD HARVEY, JAMES HARVEY, DAVID HARVEY, and JOSEPH FOOS, would operate a clandestine laboratory for the purpose of manufacturing Methamphetamine and distribute said Methamphetamine to MICHAEL RILEY, KIM HARRIS, DAVID WILLIAMS, WAYNE RUSSELL, DONALD EWERS, and other co-conspirators, for the purpose of said Methamphetamine being distributed in the State of Illinois.

It was further part of said conspiracy that defendants and co-conspirators, MICHAEL RILEY, ROBERT DUSCH, WILEY FARTHING, DAVID WILLIAMS, DEBBIE WILLIAMS, WAYNE RUSSELL, and MITZI RUSSELL, would distribute the Methamphetamine in the State of Indiana in conjunction with other co-conspirators known and unknown to the Grand Jury.

It was further part of said conspiracy that defendant and co-conspirator, DONALD EWERS, would provide legal advice and aid in the distribution of proceeds acquired as a result of the sale of Methamphetamine by acquiring assets for MICHAEL RILEY and other co-conspirators known and unknown to the Grand Jury in the names of nominees and others.

merely set out in general terms the suspected roles of the co-conspirators in a single, conspiracy to distribute methamphetamine in the State of Indiana. The proof at trial centered around this distribution scheme, and evidence demonstrated that Williams and Russell generally participated just as the indictment suggested—as purchasers and distributors of the drug. The evidence adduced at trial, viewed in the light most favorable to the government, reveals the following facts, among others, that relate to Williams's and Russell's participation in the conspiracy. Both Williams and Russell were listed in Bobby Dusch's record book as having purchased methamphetamine in Indiana from Dusch and Michael Marlow. In March, 1983, Russell met Marlow in Denver, Colorado, where Marlow obtained about ten pounds of methamphetamine from Tim Harvey. Russell and Marlow then returned with the drugs to Evansville, Indiana. When DEA agents searched Dusch's apartment in April 1983, Marlow took three pounds of the ten-pound purchase to David Williams's house for safekeeping. One of Dusch's customers then obtained an amount of the drug from Russell.

Later that year, several other co-conspirators had conversations with Williams and Russell about Michael Marlow's role in the conspiracy. The co-conspirators were concerned that Marlow was taking advantage of them. Both Williams and Russell then met with Michael Riley and agreed to begin purchasing directly from him in order to sidestep Marlow. In October 1983, Williams and Russell met Riley in Spokane, Washington and drove with Riley to David Harvey's house in Hayden Lake, Idaho, where they picked up six or seven pounds of methamphetamine. David Williams then met Riley in Los Angeles in November 1983 and paid Riley approximately $50,000. Early in 1984, Williams, Riley, and Donald Ewers discussed the fact that Marlow was purchasing methamphetamine at a substantially lower price than Riley, and voiced concern that Marlow might begin to compete directly with Williams and Riley in the Evansville area. Finally, the DEA's search of Williams's house in August 1984 uncovered large quantities of methamphetamine and cash.

■■■■ This evidence overwhelmingly demonstrates that David Williams and Wayne Russell not only participated in the conspiracy to possess and distribute methamphetamine in Indiana, but also filled the general roles set out in the indictment's unnumbered paragraphs reproduced in

It was further part of said conspiracy that defendants, TIMOTHY HARVEY, MICHAEL RILEY, DAVID WILLIAMS and DONALD EWERS had agreements as to who was to receive Methamphetamine from Timothy Harvey for distribution in the State of Indiana and what price was to be paid for the Methamphetamine to be distributed in the State of Indiana and what percentage of any purchase price was to be paid to defendant and co-conspirator, MICHAEL RILEY, for purchases made by the other co-conspirators known and unknown to the Grand Jury.

It was further part of said conspiracy that defendant and co-conspirator, DONALD EWERS, would act as a middle man between TIMOTHY HARVEY and TOM PACHECO for the purpose of procuring and obtaining quantities of Methamphetamine for re-distribution in the State of Indiana and elsewhere and that defendants and co-conspirators, DONALD EWERS and TOM PACHECO, would use a communications facility, to wit: a telephone for the purpose of distributing and arranging for the distribution of quantities of Methamphetamine to the other

co-conspirators, known and unknown to the Grand Jury.

It was further part of said conspiracy that defendants and co-conspirators, WILEY FARTHING, KIM HARRIS, DAVID WILLIAMS, DEBBIE WILLIAMS, WAYNE RUSSELL, AND MITZI RUSSELL, would distribute Methamphetamine to co-conspirators known and unknown to the Grand Jury.

It was further part of said conspiracy that defendants and co-conspirators, MICHAEL RILEY, ROBERT DUSCH, TIMOTHY HARVEY, DONALD HARVEY, JAMES HARVEY, DAVID HARVEY, JOSEPH FOOS, DONALD EWERS, DAVID WILLIAMS, DEBBIE WILLIAMS, WAYNE RUSSELL, MITZI RUSSELL, TOM PACHECO, WILEY FARTHING, KIM HARRIS, and other persons known and unknown to the Grand Jury would utilize the funds generated by the illicit sales of Methamphetamine to support their life style and that the defendants and co-conspirators would attempt to conceal the illicit income generated through the sale of Methamphetamine.

footnote 1, *supra* pp. 1030–1031. Accordingly, we dismiss the claims of variance and hold that the evidence was sufficient to prove Williams and Russell guilty of conspiracy beyond a reasonable doubt.[2]

2. *Jury instruction.* In its instructions to the jury, the trial court did not submit the seven unnumbered paragraphs as elements of the conspiracy charge. Instead, the court gave as an overarching charge its instruction number 20:

> In order to establish the offense of conspiracy, the government must prove these elements beyond a reasonable doubt.:
>
> 1. That the alleged conspiracy existed, and
>
> 2. That a defendant knowingly and intentionally became a member of that conspiracy.

 The defendants claim that the instruction is erroneous because it omitted essential elements of the charge. We find, however, that the seven unnumbered paragraphs do not constitute essential elements of the conspiracy charged and that instruction 20, along with several other instructions, adequately charged the jury. This circuit has held that "[t]he essential elements of conspiracy under section 846 are the existence of an agreement between two or more individuals, with the intent to commit an offense in violation of the Controlled Substance Act." *United States v. Sweeney,* 688 F.2d 1131, 1140 (7th Cir.1982). *See, e.g., United States v. Hinkle,* 637 F.2d 1154, 1157 (7th Cir.1981) ("Generally, an indictment is sufficient when it sets forth the offense in the words of the statute itself, as long as those words expressly set forth all the elements necessary to constitute the offense intended to be punished."). Thus, the government need not allege in the indictment, and the court need not instruct the jury to find, specific roles corresponding to the co-conspirators. *See, e.g., United States v. Roman,* 728 F.2d 846 (7th Cir.), *cert. denied,* 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984); *United States v. Garfoli,* 324 F.2d 909, 911 (7th Cir.1963) (with regard to the precursor of § 846: 21 U.S.C. § 174). *See also United States v. Mayo,* 721 F.2d 1084, 1089 (7th Cir.1983); *United States v. Umentum,* 547 F.2d 987, 991 (7th Cir.1976) (§ 846 does not even require allegation, proof, or jury instruction as to overt acts), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977).

The trial court's instructions in this case clearly contained the essential elements of a section 846 conspiracy charge—the existence of an agreement among individuals to intentionally commit offenses under the Act. Not only did the trial court instruct the jury on these elements in instruction number 20, but it also gave instructions defining the conspiracy and clarifying the jury's task:

> —Count I of the Superceding Indictment is based upon a statute which was in full force and effect at all times pertinent to this case. Title 21, United States Code, Section 846 reads as follows:
>
> Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission

---

2. Even if a variance could be found, we have determined that the defendants could not have been thereby prejudiced and thus that any variance was not fatal. We have held that "[a] variance between allegation and proof is not fatal unless the defendant has been thereby deprived of an adequate opportunity to prepare a defense or has been exposed to a risk of being prosecuted twice for the same offense." *United States v. Kuna,* 760 F.2d 813, 819 (7th Cir.1985); *see also, e.g., Mosley,* 786 F.2d at 1335–36; *United States v. Kramer,* 711 F.2d 789, 795 (7th Cir.1983). The government in no way attempted to prove a conspiracy engaged in crimes different from the ones outlined in the indictment, or to convict the defendants of multiple conspiracies where only one was charged, *see United States v. Wozniak,* 781 F.2d 95, 97–98 (7th Cir.1985). At most, the alleged scope of the conspiracy was *narrowed* at trial, but this does not prejudice the defendants. *Wozniak,* 781 F.2d at 97. The indictment therefore more than adequately notified the defendants of the conspiracy charges against them, and they were neither deprived of the opportunity to prepare their defense nor exposed to a risk of being prosecuted twice for the same offense.

of which was the object of the attempt or conspiracy.

—Counts 4, 5, 6, and 17 of the Superseding Indictment charge violations of Title 21, United States Code, Section 841(a)(1). That section provides in pertinent part that:

It shall be unlawful for any person knowingly or intentionally

(1) To manufacture, distribute, or dispense or possess with intent to manufacture, distribute or dispense, a controlled substance ...

—A conspiracy is a combination of two or more persons to accomplish an unlawful purpose, or a lawful purpose by unlawful means. While it *involves an agreement to violate the law*, it is not necessary that the persons charged met together and entered into an express or formal agreement, or that they stated, in words or writing, what the scheme was, or how it was to be effected. It is sufficient to show that they came to a mutual understanding to accomplish an unlawful act.

—In order to show that the defendants conspired to possess with intent to distribute methamphetamine under the statute, the government need not prove that any particular overt act occurred in furtherance of the conspiracy, since *the essence of a conspiracy to possess with intent to distribute methamphetamine is the criminal agreement itself*, and not the success of the conspirators in carrying out the agreement.

■ In light of the above, we find that the trial court did not omit any of the essential elements of the charge from the jury instructions. We turn then to the defendants' final claim with regard to jury instruction number 20—that it constituted a constructive amendment of the indictment. The general rule in this area is that the trial court cannot amend the indictment at the instruction stage by eliminating or changing an essential or material element of the crime. *See Stirone v. United States*, 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960); *United States v.*

*Kramer*, 711 F.2d 789, 796 (7th Cir.), *cert. denied*, 464 U.S. 962, 104 S.Ct. 397, 78 L.Ed.2d 339 (1983). As we noted above, the trial court's instructions contained all of the essential elements of the Count One conspiracy charge, and we therefore conclude that the instructions did not serve as a constructive amendment.

3. *Suppression of evidence.* With regard to Count One and the other counts on which he was convicted, David Williams challenges the admission of evidence seized during the search of his home. Although it is doubtful that this evidence, even if erroneously admitted, prejudiced Williams on the conspiracy count, we will address the admissibility question here in order to apply our holding to the other counts discussed below. Williams claims, as he did in the district court, that the evidence should have been suppressed because there was insufficient probable cause to support the search warrant. Williams has two bases for this claim: first, that the actual quantum of evidence detailed in the underlying affidavit was too small to create a reasonable belief that a crime was about to be committed and that the house contained evidence of the crime; and second, that the information contained in the affidavit referred to events so remote in time that a reasonable belief could not be created.

The United States Supreme Court has described the respective tasks of the magistrate and reviewing court as follows:

The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed. *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). Examining the affidavit under this stan-

dard, we conclude that Williams's claims are without merit, since the affidavit provided the issuing magistrate with a substantial basis.

██ The important features of the affidavit include details concerning the reliability of the confidential informant and facts indicating that the informant had sold large quantities of methamphetamine to David Williams (who he also knew as "DW") beginning in 1982, and that on one occasion he had delivered the drug to Williams's house. Further, the affidavit reported that the informant knew the Harveys and purchased quantities of methamphetamine from them. The affidavit recited several items of evidence demonstrating that David Williams and Tim Harvey had stayed in a motel in Mount Vernon, Illinois, on June 23, 1984, as well as evidence suggesting that the two had engaged in a drug transaction there. Finally, the affidavit revealed a sequence of events that occurred in August, 1984. On August 13, 1984, a telephone call from Tim Harvey to David Williams's house was intercepted by Agent Blackketter. According to the tape recording, Harvey asked the woman who answered the phone if "DW" was home. Upon hearing that he was not, Harvey asked that "DW" return his call. On August 14, 1984, a call coming in to Tim Harvey was intercepted. The affidavit then stated:

> Special Agent Blackketter told your affiant that the call was incoming to 605–673–4943 and that upon speaking to Tim HARVEY the caller identified himself as "DW". HARVEY then asked "DW" if he was "ready to get in touch" and that DW replied that he was but that "things are warm here but I don't think its us". Special Agent Blackketter then told your affiant that HARVEY and "DW" discussed various meeting places including the "last place" which "DW" identified as "Illinois" before deciding to meet at the Drury Inn, located directly across I–70 from the St. Louis Airport entrance. HARVEY advised "DW" that he would recontact him and give him an exact date. Special Agent Blackketter told your affiant that "DW" told HARVEY he "wanted 10 but could handle 15". "DW" and HARVEY then agreed the price would be the "same as the last time". "DW" stated he would bring cash with him to the meeting.

The affidavit concluded by detailing facts indicating that Williams and Harvey had not yet consummated the deal and that the cash Williams needed for the purchase was likely to be hidden in his home.

██ This affidavit provided the magistrate with a substantial basis for concluding that probable cause existed for the belief that a drug transaction between David Williams and Tim Harvey was imminent and that funds to be used by David Williams for the purchase of the drugs were in his house. The fact that details of drug transactions occurring in 1982 and 1983 were included in the affidavit does not mean that the affidavit concerned events too remote in time to create probable cause. Instead, those details provided vital background information that bolsters the reliability of the confidential informant and the affiant, as well as depicting the operating methods of a continuing scheme. Moreover, the affidavit clearly contained evidence that a new crime was about to be committed. David Williams's claim that the search warrant rested on insufficient probable cause therefore must be dismissed.

### C. *Wayne Russell—Count Four.*

### *David Williams—Counts Five and Six.*

██ Counts Four, Five, and Six of the Superceding Indictment arose out of a drug purchase that took place in Denver, Colorado, in March of 1983. According to the testimony at trial, Michael Riley and Michael Marlow arranged the purchase while they were in Tampa, Florida. Marlow then travelled to Denver to meet Tim Harvey. Wayne Russell joined Marlow in Denver and the two returned to Evansville with some ten pounds of methamphetamine. Marlow testified that he maintained control of the drugs in Evansville, but that Wayne Russell had access to them because he had

a key to Marlow's house and Marlow had allowed him access to the drugs. In April 1983, a DEA agent searched Bobby Dusch's apartment. After the raid, according to trial testimony, Marlow took the three remaining pounds of the methamphetamine to David Williams's house.

The government charged Russell in Count Four with possession of approximately one pound of methamphetamine, with intent to distribute, in March 1983. David Williams was charged in Count 5 with possession of two pounds with intent to distribute and in Count 6 with possession of one pound with intent to distribute. Both urge us to overturn the convictions on the ground of insufficient evidence. Although the facts make this a close call, we cannot conclude that no rational trier of fact could have found Russell and Williams guilty beyond a reasonable doubt.

Wayne Russell's position is that the evidence fails to demonstrate that he had either actual or constructive possession of the drugs. We find instead that it is sufficient to establish both. Testimony revealed that Russell was a good customer of Marlow and Dusch and that by January 1983 he was purchasing about a half a pound of methamphetamine every two weeks. This buying pattern is enough, along with the evidence of the Denver purchase, to establish that Russell had actual possession, with intent to distribute, of one pound in March 1983. Constructive possession requires only the intent and ability to exercise dominion and control over an item. See, e.g., United States v. Herrera, 757 F.2d 144, 150 (7th Cir.1985). Testimony indicated that Russell did have the intent and the power to dispose of or distribute the drugs, since he was given access to them by Marlow and was selling quantities of methamphetamine throughout the first part of 1983. This is sufficient evidence to support the jury's verdict.

■ David Williams contends that there was a complete failure of proof as to Counts Five and Six, pointing to the lack of direct evidence in the record. There is some circumstantial evidence, however, establishing his guilt. First, testimony demonstrated that by January 1983 Williams was one of Marlow's main customers and had a pattern of buying about a pound of methamphetamine every two weeks. Second, the evidence revealed that of the ten pounds of methamphetamine brought to Evansville in March, 1983, only three pounds remained by mid-April. These two facts taken together raise the inference that Williams purchased and possessed at least three pounds in or about March 1983. See United States v. Kramer, 711 F.2d 789, 797 (7th Cir.1983) (variance of "a few weeks" in dates of offense is harmless). While this evidence falls short of being overwhelming, it is difficult to conclude that a rational trier of fact could not find that it establishes guilt beyond a reasonable doubt. Thus, we affirm the convictions on Counts Five and Six, but we caution that the government here has met its burden of proof with the least possible amount of evidence. We note, however, that this results not from a paucity of evidence of wrongdoing, but rather from the government's questionable drafting of the indictment in terms of dates of possession.

D. *David Williams—Count Fourteen.*

■ The Superceding Indictment charged David Williams in Count Fourteen with interstate travel on or about June 23, 1984, with the intent to carry on an unlawful activity. The count specified that Williams at that time travelled from Evansville to Mount Vernon, Illinois, where he met with Tim Harvey in order to distribute proceeds of methamphetamine sales and to take delivery of methamphetamine. Williams argues that the government failed to produce sufficient evidence of his guilt on this count. We disagree and briefly summarize the evidence in the record. After establishing a pattern of transactions between David Williams and Tim Harvey, testimony revealed that both Harvey and Williams registered at the Holiday Inn in Mount Vernon, Illinois on June 23, 1984. Moreover, a wire interception of a call from

Williams to Harvey on August 14, 1984 evidenced what transpired in Mount Vernon. According to the record, Williams asked Harvey during the telephone call whether Harvey wanted the transaction to occur the same way as "last time." Harvey could not remember where they had last done business, so Williams reminded him that it had been in Illinois. Williams then informed Harvey that he wanted ten (presumably pounds of methamphetamine) but could take fifteen, and that he would have cash with him. Finally, the search of Williams's residence in August 1984 uncovered large amounts of methamphetamine and cash. This evidence is sufficient to establish Williams's guilt on Count Fourteen beyond a reasonable doubt.

### E. *David Williams and Wayne Russell—Counts Sixteen and Seventeen.*

Counts Sixteen and Seventeen relate to the October 1983 trip to Spokane, Washington that Williams and Russell took together. Count Sixteen charged them with interstate travel with the intent to carry on an unlawful activity, and Count Seventeen charges them with possession of six pounds of methamphetamine in Evansville with intent to distribute. Aside from sufficiency claims, Williams and Russell raise two issues regarding the face of the indictment.

■ The first issue is the omission of the word "thereafter" from Count 16. Count 16 reads:

On or about October 9, 1983, in the Southern District of Indiana, Evansville Division and elsewhere, DAVID WILLIAMS and WAYNE RUSSELL, defendants herein, did knowingly and unlawfully travel in interstate commerce from Evansville, Indiana, to Spokane, Washington, and Idaho, with the intent to promote, manage, carry on and facilitate unlawful activities as defined in Title 18, United States Code, Section 1952(b)(1), to wit: a business enterprise involving the distribution of Methamphetamine, a Schedule II Non-Narcotic Drug Controlled Substance, in violation of Title 21,

United States Code, Section 841(a)(1) and 846 in that on or about October 9, 1984 [sic], DAVID WILLIAMS and WAYNE RUSSELL, defendants herein, did perform said unlawful activity in that DAVID WILLIAMS and WAYNE RUSSELL did meet with MICHAEL RILEY and TIMOTHY HARVEY and receive approximately five to six pounds of Methamphetamine and brought the Methamphetamine back to Evansville, Indiana, for distribution, all in violation of Title 18, United States Code, Section 1952.

The applicable statute, 18 U.S.C. § 1952, contains this language:

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and *thereafter* performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

Williams and Russell argue that since the word "thereafter" was not included in the count, the trial judge should have dismissed it. This argument is clearly meritless, since the count did allege that subsequent to the interstate travel, the two committed an unlawful activity. We can discern nothing in the cases that requires the use of the word "thereafter."

■ The second claim relates to a typographical error in Count 16. At one point in the count, the date is given as October 9, 1983; in another place, the count speaks of October 9, 1984. This mistake went unnoticed until the jury, during its deliberations, called the court's attention to the discrepancy. The court responded to the jury's note with a note of its own: "You have heard the evidence with regard to Count 16

and must make a determination based upon your recollection of the evidence." Williams and Russell assert that since the jury found them guilty on the count in the absence of any evidence relating to the date of October 9, 1984, it must have amended the indictment. Moreover, the court allowed the government to amend the indictment by post-verdict motion. We find nothing improper in this amendment. Typographical errors may be corrected without resubmitting the indictment to the grand jury; only matters of substance must be sent back for amendment. *See, e.g., United States v. Kramer*, 711 F.2d 789, 797 (7th Cir.1983); *United States v. Denny*, 165 F.2d 668, 669 (7th Cir.1947). Since this error was obviously a typographical one, the court correctly granted the government's motion to amend the indictment.

■ Finally, we cannot sustain the claims of insufficient evidence of Counts Sixteen and Seventeen. The government had direct evidence that Williams and Russell travelled to Spokane and purchased methamphetamine in Idaho from David Harvey, and it presented circumstantial evidence sufficient to demonstrate beyond reasonable doubt that they returned with the drugs to Evansville for distribution. Accordingly, we affirm the convictions on these counts.

### III.

For the foregoing reasons, Debbie Williams's conviction on Count One is RE-VERSED, and all other convictions are AF-FIRMED.

CUDAHY, Circuit Judge, concurring in part and dissenting in part.

It is with the utmost reluctance that I indicate any dissent from the majority's able, indeed valiant, effort to salvage this flawed prosecution. I cannot, however, bring myself to accept the reasoning which sustains both Counts 5 and 6 because I can find no way in logic to tie the government's evidence to what the grand jury charged.

The grand jury charged that "[i]n or about March 1983, the exact date being to the grand jury unknown," David Williams possessed with intent to distribute "approximately two pounds of Methamphetamine." It then further charged that "[i]n or about the month of March 1983, the exact date being to the grand jury unknown," David Williams possessed with intent to distribute "approximately one pound of Methamphetamine." The government urges that two pieces of evidence prove these charges beyond a reasonable doubt: (1) as of January 1983 Williams was buying from Marlow one pound of methamphetamine every two weeks and (2) of the ten pounds of methamphetamine that Russell and Marlow brought to Evansville in March 1983, only three pounds remained by mid-April 1983.

The second bit of evidence is, so far as I can tell, wholly irrelevant. Nothing short of sheer speculation suggests that David Williams possessed any of the "missing" seven pounds of methamphetamine—except (perhaps) biweekly one-pound purchases. As for the evidence of these January purchases, the majority treats the two-month difference in dates as a nonfatal variance between indictment and proof. Maybe this is true; and maybe it would be reasonable in any event to infer that a business relationship that is thriving in January will not break up before March. However, I do not believe that the most liberal interpretation of the evidence presented—that during the early part of 1983 David Williams made a series of one-pound methamphetamine purchases—can be stretched to cover carefully drafted Counts 5 and 6, which charge that at one time in March 1983 Williams possessed two pounds of methamphetamine and that at another he possessed one pound. The evidence presented is clearly insufficient to sustain a conviction on both of these counts; perhaps it is barely sufficient to sustain a conviction on Count 6, possession of one pound of methamphetamine.

As to these counts, then, I respectfully dissent.

COFFEY, Circuit Judge, dissenting in part.

I join with the majority in upholding the convictions of David Williams and Wayne

Russell but at the same time I am convinced that the court should sustain the jury's conviction of Debbie Williams.

"When assessing a challenge to the sufficiency of the evidence, we must affirm a verdict of guilty if the evidence, when viewed in the light most favorable to the government, establishes that *any* rational trier of fact could have found the defendant guilty of the crime charged. *Jackson v. Virginia,* 443 U.S. 307 [99 S.Ct. 2781, 61 L.Ed.2d 560] (1979)," *United States v. O'Malley,* 796 F.2d 891, 902 (7th Cir.1986). The defendant Debbie Williams challenges the sufficiency of the government's proof of her being a member of a conspiracy to possess and distribute methamphetamine in violation of 21 U.S.C. § 846.[1] Specifically, she maintains that the district court erred in admitting the statement of her co-conspirator David Williams in evidence against her at trial because the government failed to establish a proper basis for the admission of the statement at the *Santiago* hearing. Absent that statement, she contends the evidence was insufficient to convict her. The majority states that "the evidence adduced at the *Santiago* hearing failed to provide a basis for the admissibility of the co-conspirator's statement against Debbie Williams," and that "[i]n the absence of that erroneously admitted evidence ... no rational trier of fact could have found Debbie Williams guilty of conspiracy beyond a reasonable doubt." I disagree with each of these conclusions.

A. *The government established a proper basis for the admission of David Williams' statement at the Santiago hearing.*

The prosecution stated at the *Santiago* hearing, at trial, and on appeal that it

sought admission of David Williams' statement "to prove the truth of the matter asserted," i.e. that Debbie Williams did in fact physically count out $22,000 to $24,000 in drug purchase money paid over by herself and her husband to Marlow in July, 1983. Fed.R.Evid. 802 provides that "Hearsay is not admissible except as provided in [other] rules ..." The government sought to have the statement of David Williams admitted, relying on Fed.R. Evid. 801(d)(2)(E), which provides that a "statement is not hearsay if the statement is offered against a party and is a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."

In *United States v. Santiago,* 582 F.2d 1128 (7th Cir.1978), this court stated that Rule 104 of the Federal Rules of Evidence, "requires a preliminary determination by the trial judge as to the admissibility of the declaration of a co-conspirator." *Id.* at 1131. The court went on to state that "[u]nder Rule 104 the competence of a co-conspirator's declaration justifying its admissibility depends upon whether or not the existence of the conspiracy has been sufficiently established, and whether under Rule 801(d)(2)(E) the declaration was made during the course and in furtherance of the conspiracy." *Id.* In *United States v. Coe,* 718 F.2d 830 (7th Cir.1983), this court stated that in order to invoke Rule 801(d)(2)(E), "the government must prove by a preponderance of independent evidence that a conspiracy existed, that both the declarant and the defendant were members of the conspiracy, and that the statement was made during the course and in furtherance of the conspiracy." *Coe,* 718 F.2d at 835. Thus,

---

1. Debbie Williams was convicted of violating 21 U.S.C. § 846, in conspiring to violate 21 U.S.C. § 841(a)(1).

 21 U.S.C. § 846 reads:

 "§ 846. Attempt and conspiracy.

 Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the

commission of which was the object of the attempt or conspiracy."

 21 U.S.C. § 841(a)(1) reads:

 "(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

 (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;"

to establish the admissibility of David Williams' statement at the *Santiago* hearing the government had only to demonstrate by a preponderance of the evidence that the declarant, David Williams, was a member of the conspiracy, that Debbie Williams was also a member of the conspiracy, and that David Williams' statement to Marlow in the presence of his wife, Debbie Williams, was made in furtherance of the conspiracy. Debbie Williams concedes that the government proved that a conspiracy to possess and distribute methamphetamine existed and that her husband was a member of that conspiracy. Appellant's Brief at 29–30. Debbie Williams does not contest the fact that her husband's statement that Debbie had "already counted the money" was made in furtherance of the conspiracy. Debbie's only contention on appeal is that the government failed to establish at the *Santiago* hearing that Debbie Williams was a member of the conspiracy. Appellant's Brief at 30.

The law is clear that "[o]nce the Government proves the existence of a conspiracy, the Government need only offer 'slight evidence' to prove that an individual was a member of the conspiracy." *United States v. Gironda*, 758 F.2d 1201, 1217 (7th Cir. 1985).[2] In analyzing whether the government established a proper foundation for the admission of David Williams' statement at the *Santiago* hearing, we must remember the admonition that "[t]he formalities of an agreement are not necessary and are usually lacking since the mark of a successful conspiracy is secrecy." *United States v. Varelli*, 407 F.2d 735, 741 (7th Cir.1969). The clandestine nature of conspiracies should make us especially tolerant of circumstantial evidence of conspiratorial agreement. *United States v. Perry*, 747 F.2d 1165, 1169 (7th Cir.1984). The government is not required to prove its entire case with direct evidence of covert, marital conspiracy or else forego prosecution of this

vicious, insidious crime. "[I]t is settled that the possible inference of a defendant's guilt may be created by either direct evidence or circumstantial evidence." *United States v. Glasser*, 443 F.2d 994, 1006–07 (2d Cir.), *cert. denied*, 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971).

"A conviction may rest solely on circumstantial evidence, such as that presented in this case. *United States v. Young*, 568 F.2d 588, 589 (8th Cir.1978); *United States v. Carlson*, 547 F.2d 1346, 1360 (8th Cir.1976), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977). Such evidence is 'intrinsically as probative as direct evidence,' *United States v. Taylor*, 599 F.2d 832, 838 (8th Cir.1979), and accordingly, is considered under the standard for determining the sufficiency of direct evidence. *Durns v. United States*, 562 F.2d 542, 546 (8th Cir.), *cert. denied*, 434 U.S. 959, 98 S.Ct. 490, 54 L.Ed.2d 319 (1977)."

*United States v. Two Eagle*, 633 F.2d 93, 97 (8th Cir.1980). Indeed, circumstantial evidence "may be the sole support for a conviction." *United States v. McCrady*, 774 F.2d 868, 874 (8th Cir.1985). "Circumstantial evidence is not less probative than direct evidence, and, in some instances, is even more reliable." *United States v. Andrino*, 501 F.2d 1373, 1378 (9th Cir.1974). *See United States v. Nelson*, 419 F.2d 1237, 1239 (9th Cir.1969).

The government presented substantial circumstantial evidence at the *Santiago* hearing to establish that Debbie Williams was a member of a conspiracy to possess and distribute methamphetamine specifically that: (1) Debbie Williams was present in Colorado Springs when her husband David Williams paid Michael Marlow $22,000 in packs of $1,000 for methamphetamine that David Williams had previously received (Tr. 1706); (2) Debbie Williams furthered the conspiracy by taking care of a co-conspirator's (Marlow's) children and returning the

**2.** "The slight evidence rule is no more a substitute for the preponderance standard used for admission of co-conspirator hearsay than it is for the reasonable doubt standard used for the ultimate determination of guilt. It merely describes the type of evidence that may suffice to prove involvement under these standards ..." *United States v. Medina-Herrera*, 606 F.2d 770, 773 n. 3 (7th Cir.1979).

children to Evansville, Indiana, in order that Marlow could travel to Las Vegas and participate in another drug transaction (Tr. 1710); (3) Debbie Williams advised David Williams of a phone message from Tim Harvey, a known drug dealer and one of her husband's suppliers (Tr. 1740); (4) probable cause was found for the issuance of a search warrant for the residence of Debbie and David Williams where over $40,000 in currency and 38 grams of methamphetamine were discovered concealed in a vanity cabinet under the bathroom sink of Debbie and David Williams' home (Tr. 1743); (5) although her husband had no visible means of support, David Williams often had large sums of money in his possession and traveled to different parts of the country with Debbie accompanying him on occasion (Tr. 1701, 1706, 1711, 1720, 1763); and (6) the reference in the transcript to a trip Debbie Williams made with David Williams during which he turned over cash to Riley, a known drug dealer (Tr. 1732).

Given the overwhelming amount of evidence, direct and circumstantial, presented at the *Santiago* hearing, the government submitted far more than the required "slight evidence" required to establish "to prove that an individual [Debbie Williams] was a member of the conspiracy." *United States v. Gironda*, 758 F.2d 1201, 1217 (7th Cir.1985). From a review of the record, the majority mistakenly holds that the government at the *Santiago* hearing failed to prove that Debbie Williams was a member of the conspiracy by a preponderance of the evidence in violation of 21 U.S.C. § 841(a)(1) and, thus, David Williams' statement to Marlow made in Debbie Williams' presence that Debbie "had already counted the money" should not have been admitted into evidence at trial. I am unable to agree, in light of the amount of evidence the government presented of a clear, convincing, direct and circumstantial nature, that the government failed to prove that Debbie Williams did not know of and did not participate in a conspiracy to sell and distribute illegal drugs. Common sense reveals that drug dealers do not conduct their

illicit transactions in the presence of strangers to their conspiracies. *See United States v. Perry*, 747 F.2d 1165, 1169 (7th Cir.1984). Drugs and cash were hidden at the Williams' residence, and large sums of money passed between David Williams and known drug suppliers in Debbie Williams' presence. All of this drug-related activity in Debbie's presence, and the very presence of this large amount of money and drugs in her home, her accepting and relaying drug information, and her conveyance of a co-conspirator's children to their home in order to allow him to further the conspiracy make it more than obvious that Debbie Williams had knowledge of and actively participated in the conspiracy. The law and society have long recognized the particular danger that collective criminal activity (conspiracy) poses to our way of life. In *Callanan v. United States*, 364 U.S. 587, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961), the U.S. Supreme Court stated:

"Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality. Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish. Nor is the danger of a conspiratorial group limited to the particular end toward which it has embarked. Combination in crime makes more likely the commission of crimes unrelated to the original purpose for which the group was formed. In sum, the danger which a conspiracy generates is not confined to the substantive offense which is the immediate aim of the enterprise."

*Id.* at 593–94, 81 S.Ct. at 325. We have joined other courts in repeatedly quoting and applying the language of the Eighth Circuit in *Phelps v. United States*, 160 F.2d 858, 867–68 (8th Cir.1947) that:

"Once there is satisfactory proof that a conspiracy has been formed, the question of a particular defendant's connection with it may be merely a matter of wheth-

er the stick fits so naturally into position in the fagot as to convince that it is part of it. It is therefore possible for the circumstances of an individual defendant's participation in an established conspiracy to become substantial from their weight in position and context, though in abstraction they may seem only slight." *See, e.g. United States v. Gironda,* 758 F.2d 1201, 1217 (7th Cir.1985); *United States v. West,* 670 F.2d 675, 685 (7th Cir. 1982); *United States v. Harris,* 542 F.2d 1283, 1305 (7th Cir.1976).

The majority grounds its erroneous holding that "the evidence adduced at the *Santiago* hearing failed to provide a basis for the admissibility of the co-conspirator's statement against Debbie Williams" on *United States v. Dalzotto,* 603 F.2d 642, 645 (7th Cir.1979). Although the *Dalzotto* court held in one section of the opinion that "[m]ere presence at the scene of the crime or association with conspirators or knowledge that something illegal is going on will not by themselves support a conspiracy *conviction." Dalzotto,* 603 F.2d at 645 (emphasis added). At the same time, the law is eminently clear that the government need only present that amount of evidence required to meet the preponderance of evidence standard and is not required to present evidence at the *Santiago* hearing sufficient to establish the proof required for conviction beyond a reasonable doubt. Thus, *Dalzotto* does not provide a sound foundation for the majority's argument that "[t]he government thus could not demonstrate [at the *Santiago* hearing] that Debbie Williams was a member of the conspiracy without introducing some evidence that went to more than her association." On the contrary, for some reason the majority fails to set forth that part of the *Dalzotto* opinion that states:

"[P]resence is put forward here to establish the existence of the conspiracy merely as a precondition for the admission of other evidence. For that purpose it need only be demonstrated *by a preponderance of the evidence, rather than beyond a reasonable doubt.* Although presence is insufficient to sustain convic-

tion for conspiracy, it may nonetheless make participation in the conspiracy ... *'more likely than not.'* "

*Dalzotto,* 603 F.2d at 645 (emphasis added).

Evidence submitted at the *Santiago* hearing demonstrated that Debbie Williams was present when her husband paid the drug supplier Marlow $22,000 in Colorado Springs. In addition, Debbie admits that at the *Santiago* hearing, "the Government's evidence established, under a joint possessory theory, that she was in possession of some methamphetamine at her residence." Appellant's Brief at 31.

Furthermore, "[P]resence has been sufficient evidence of knowing participation in a conspiracy when there were suspicious circumstances, and the existence of the conspiracy was already established." *United States v. Dalzotto,* 603 F.2d 642, 645 (7th Cir.1979). See also *United States v. Mancellas,* 580 F.2d 1301, 1308 (7th Cir.1978); *United States v. Holmes,* 452 F.2d 249, 256 (7th Cir.1971). Rule 801(d)(2)(E) "calls for generous treatment of this avenue of admissibility." Fed.R.Evid. 801, *Notes of Advisory Committee on Proposed Rules, R. 801(d)(2).* The focus of our inquiry should be the reliability of David Williams' alleged "hearsay" statement. Evidence of Debbie's membership in a conspiracy, (i.e. her being party to an agreement to possess and distribute methamphetamine) should only *bolster* (not subtract from) the inherent reliability of David Williams' supposedly "hearsay" statement.

The government offered proof through the testimony of agents at the *Santiago* hearing that Debbie Williams accompanied her husband David on what he referred to as "business trips." Specifically, "in or about July, 1983, ... at Colorado Springs ... David Williams and Debbie Williams delivered approximately twenty-two to twenty-four thousand dollars ... to (Marlow) ... that David Williams and Debbie Williams were present when the money was delivered and that the money was delivered in packs of $1,000." (Tr. 1706). Debbie knew of Marlow's participation in a

conspiracy to distribute the illegal drugs, and in furtherance of this conspiracy, she agreed to take care of Marlow's children and to return them to Indiana, enabling Marlow to travel unencumbered to Las Vegas to consummate another drug deal. (Tr. 1710. *See also* Tr. 883–85). Debbie also relayed a phone message from Tim Harvey, a known drug supplier, to her husband. Furthermore, testimony at the *Santiago* hearing established that over $40,000 and thirty-eight grams of methamphetamine had been stored in a vanity under the bathroom sink of the Williams' home.

Even though the government is not required to meet the highest burden of proof, beyond a reasonable doubt, at a *Santiago* hearing, the government established beyond a reasonable doubt that Debbie Williams not only knew of the drug conspiracy, but also actively participated in the same.

### B. *Absent the hearsay statement there was sufficient evidence introduced at trial to support the conviction of Debbie Williams.*

I fail to understand how the majority can conclude that Debbie Williams was not a member of the alleged conspiracy to distribute drugs. Debbie Williams forgets and casts aside the overwhelming amount of circumstantial evidence and successfully directs the majority's attention to her newfound theory concerning the absence of direct evidence that "[she] ever agreed to sell methamphetamine to anyone [or] ever sold any methamphetamine ..." (Appellant's Brief, at 25). However, courts have repeatedly held that the "inference of the defendant's guilt of a criminal offense may be created either by direct evidence or by circumstantial evidence" and "circumstantial evidence is of equal probative value to direct evidence." *United States v. Glasser,* 443 F.2d 994, 1006–07 (2d Cir.), *cert. denied,* 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971). Indeed, circumstantial

evidence "may be the sole support for a conviction." *United States v. McCrady,* 774 F.2d 868, 874 (8th Cir.1985). It is also well settled that "[O]nce the Government proves the existence of a conspiracy, the Government need only offer 'slight evidence' to prove that an individual was a member of the conspiracy." *United States v. Gironda,* 758 F.2d 1201, 1217 (7th Cir. 1985). Debbie Williams concedes on appeal that her husband was a member of the conspiracy and does not deny that she had knowledge of the conspiracy.

Debbie argues on appeal only that the evidence did not establish beyond a reasonable doubt that she was a *member* of the conspiracy.[3]

At trial, the evidence established that Debbie Williams accompanied her husband on trips to Colorado Springs, Colorado; Custer, South Dakota; and New Orleans, Louisiana; and on each of these trips her husband made substantial drug purchase payments in her presence. In Colorado Springs her husband paid as follows: Marlow $22,000; in New Orleans, Debbie's husband paid Riley $10,000; and in Custer he paid Rodney Shaddy $25,000 for previously delivered drugs.

The trial transcript during the questioning of Marlow reads:

"Q. Now, you met with them in their hotel room?

A. Yes, sir, I did.

Q. Who was present?

A. Debbie Williams, Dave Williams and myself.

Q. How much money was delivered to you?

A. Approximately $22,000.

Q. *By whom?*

A. *David and Debbie Williams ...*"

(Tr. 883) (emphasis added). In addition to paying Marlow the drug money, Debbie and her husband conveyed his (Marlow's) children in their car to Evansville, Indiana in order that Marlow might travel unen-

---

3. Conviction of Debbie under 21 U.S.C. § 846 required only "proof of an agreement" (between someone else and her) to violate § 841(a)(1).

cumbered to Las Vegas, Nevada, to consummate another drug deal. (Tr. 1710).

In 1984, Debbie Williams also accompanied her husband to the Mardi Gras festival in New Orleans, Louisiana, and at that time, her husband (David) paid about $10,000 to another drug supplier, Riley, in Debbie's presence. (Tr. 434–5) During this entire period and in particular during the first four months of 1984, Debbie's husband was unemployed and collected unemployment compensation, yet she and her unemployed husband travelled to New Orleans, Louisiana and Custer, South Dakota. At trial, the government clearly established that Debbie and her unemployed husband spent large amounts of cash without having any other visible means of income or support. It is obvious that Debbie and her husband used the profits from these drug sales to finance their trips and maintain their lifestyle.

In July of 1984, Debbie and David Williams traveled to Custer, South Dakota to make another drug-related payment. In Debbie's presence, her husband paid out $25,000 to Rodney Shaddy, explaining at that time that there had been some drug shrinkage and thus the payment was unexpectedly small. (Tr. 1038–9, 1067–70) Rodney Shaddy testified as follows:

"Q. (By Mr. Thar) I believe the question is, Mr. Shaddy, when he took the envelope out and put it on the table what did he say to you and what did you say to him?

A. At first it was just small talk for a couple of minutes, and then he picked up the envelope and took out a piece of paper that was in the envelope and he said that Tim was expecting more money than this, but he said there was some shrinkage and he had on a piece of paper some numbers in pounds and ounces. He said to show this to Tim when you see him because this right here will explain why there is not as much money

here as Tim thought he had coming to him.

Q. You indicated there was a woman in the room. Did she ever engage in any conversation?

A. No, she never did.

Q. Was she present throughout the conversation?

A. Yes.

Q. How much money was in the envelope?

A. $25,000."

(Tr. 1040–41).

On August 14, 1984, Debbie's husband telephoned his supplier, Tim Harvey, in order to arrange a drug deal. A transcript of that phone call reveals that he was returning the supplier's call. (Tr. 1248). Debbie had received this call from Harvey and informed her husband of it. The record reveals that Debbie had knowledge that Tim Harvey directly and indirectly[4] supplied her husband with the drugs he sold and in fact she carried his telephone number in her purse. (Government Ex. 168, Tr. 1277). In addition, the record discloses that Debbie and David Williams' only contacts with Tim Harvey were for the purpose of making drug deals. Obviously, the jury could reasonably infer that Debbie well knew the supplier's (Harvey's) purpose in calling, and her husband's purpose in returning the call. Therefore, in notifying her husband of Harvey's call, Debbie knowingly acted as an intermediary between her husband and the seller who was ready, willing, and able to sell and deliver the drugs, much as a marketmaker or broker would connect a seller and buyer in the stock market or the real estate market. In this case, the jury was instructed that "you should weigh the evidence and give credit to the testimony in light of your own experience and observations in the ordinary affairs of life." Jury Instruction No. 44. Thus, the members of the jury were entitled to use the common sense they had gained in the ordinary affairs of their

---

**4.** The drugs that David Williams purchased from Riley and Marlow were manufactured by Harvey.

daily lives. The jury could reasonably infer that in relaying Harvey's telephone message to her husband, Debbie knowingly furthered a drug sale which would produce income for herself and her husband.

The government, after establishing probable cause, obtained a search warrant for the residence of Debbie and David Williams. The subsequent search of the Williams' home revealed large amounts of money and drugs stashed in the Williams' house. Debbie's counsel conceded that the jury could reasonably infer that this money was derived from drug sales. (Tr. 1324) Considering that Debbie was present on at least three occasions when her husband paid drug suppliers large amounts of cash and that she travelled with him to consummate at least three drug deals, it is inconceivable that she had no knowledge of the source of money and drugs hidden in her home. She knew of her unemployed husband's drug transactions. She well knew that the money her husband used to finance their trips and maintain their lifestyle could only come from his drug sales.

Debbie's purse contained $1,165 in cash even though, as I pointed out earlier, she and her husband were unemployed. Her purse also held many slips of paper bearing telephone numbers of her co-conspirators, such as Tim and David Harvey, and the hotel room numbers in which they had met to transact their illicit drug business. (Government Exhibit 168, Tr. 1277).

Thus, the record clearly supports an inference that not only did Debbie Williams know of the conspiracy, but that knowing of it, she acted in furtherance of the conspiracy; and that so knowing and so acting, she profited by the conspiracy. Based on the evidence before it, the jury was justified in concluding that the government established beyond a reasonable doubt that Debbie Williams was a member of the conspiracy.

In *United States v. Mancellas,* 580 F.2d 1301, 1308 (7th Cir.1978), a unanimous panel wrote that "presence or a single act will suffice [for conviction of conspiracy] if the circumstances permit the inference that the presence or act was intended to further the ends of the conspiracy." In *Mancellas,* the court relied on this fundamental principle of conspiracy law to uphold the conviction of a man whose sole contacts with conspirators were driving one of them from the airport to several motels, dropping him off at his home, picking him up again the following morning, and *being present* in a motel room in which a drug transaction was taking place. The court held that the "circumstances ... made it highly unlikely that [the defendant's] presence was innocently explainable." 580 F.2d at 1308. Similarly, Debbie Williams was no "innocent bystander." Debbie Williams was present at and actively participated in numerous drug transactions with her husband. She conveyed a co-conspirator's children across the country to their home in order that her co-conspirator might participate in another drug transaction. She carried the phone numbers of known drug dealers in her purse as well as hotel and room numbers where drug transactions had taken place. She was also present when government agents, pursuant to a search warrant, confiscated over $40,000 in cash and 38 grams of methamphetamine from the home she shared with her husband. "This is not a case where an *otherwise innocent* party is implicated by his mere presence." *Dalzotto,* 603 F.2d at 645 (emphasis added). The government's evidence clearly established that Debbie's presence and acts "were intended to further the ends of the conspiracy." *Mancellas,* 580 F.2d at 1308.

In *United States v. Holmes,* 452 F.2d 249, 256 (7th Cir.1971), another unanimous panel upheld the conspiracy conviction of a defendant present during a drug transaction. The defendant and the co-conspirators also knew each other's unpublished telephone numbers. The court held that "a business, rather than purely social, relationship ... could reasonably be inferred." *Id.* I have already pointed out that common sense suggests that drug dealers do not conduct their illicit transactions in the presence of strangers to their conspiracies.

*See United States v. Perry,* 747 F.2d 1165, 1169 (7th Cir.1984). *Cf. United States v. Harris,* 542 F.2d 1283, 1306 (7th Cir.1976) ("the other conspirators' willingness to discuss illegal activities in their presence, knowing [the defendants] were police officers, is also to some extent indicative of [the defendants] participation.") *United States v. Perry,* 747 F.2d 1165, 1169 (7th Cir.1984). Here, drug dealers openly discussed their deals in Debbie's presence. Indeed, Marlow testified that he received money *from* Debbie and her husband. Marlow testified as follows:

"Q. Now, you met with them in their hotel room?

A. Yes, sir, I did.

Q. Who was present?

A. Debbie Williams, Dave Williams and myself.

Q. How much money was delivered to you?

A. Approximately $22,000.

Q. *By whom?*

A. *David and Debbie Williams ...*"

(Tr. 883) (emphasis added).

A well known drug supplier, Tim Harvey, counted on Debbie to relay a phone message to facilitate a drug deal. (Tr. 1248). Debbie knowingly kept, in her purse, the information necessary (telephone and hotel room numbers) to contact drug dealers and suppliers on a moment's notice. (Government Ex. 168, Tr. 1277). Here too, "a business, rather than purely social, relationship ... could reasonably be inferred." *Holmes,* 452 F.2d at 256.

The majority refuses to accept the jury's conviction of Debbie on the basis of this circumstantial evidence, even though the law is well settled that: "A conviction may rest solely on circumstantial evidence...." *United States v. Young,* 568 F.2d 588, 589 (8th Cir.1978). "[C]ircumstantial evidence is intrinsically as probative as direct evidence even where the conviction rests solely upon circumstantial evidence." *United States v. Taylor,* 599 F.2d 832, 838 (8th Cir.1979). By refusing to accept the probative value of this circumstantial evidence,

this court today mandates that the government present direct evidence of a partner's (wife's) participation or forego prosecution of partners for conspiracy to distribute drugs. This court must affirm a conviction if, after viewing all of the evidence in the light most favorable to the government, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). "The court of appeals is bound by the rule that resolution of conflicting evidence is exclusively within the discretion of the jury, as the trier of fact, and its verdict must be given added weight when the opportunity to hear and observe the witnesses is considered." *United States v. Vigil,* 743 F.2d 751 (10th Cir.1984). "Issues of credibility, the weight of the evidence, and conflicts in evidence are, of course, matters for the jury." *U.S. v. Parr,* 516 F.2d 458, 464 (5th Cir.1975). "Furthermore, a jury may believe only part of a story, and disbelieve another part." *Id.*

"Without a doubt, the public has a strong interest in prosecuting narcotics dealers." *United States v. Regilio,* 669 F.2d 1169, 1173 (7th Cir.1981). "Traffic in illicit drugs is a matter of pressing national concern...." *United States v. Zylstra,* 713 F.2d 1332, 1338 (7th Cir.1983). Drug abuse can and does produce devastating effects in the lives of our fellow Americans, and our governmental agencies must be allowed, within the confines of our cherished constitutional safeguards, to effectively prosecute drug conspirators in this country. By requiring greater evidence to uphold the conviction of Debbie Williams, the court today places another obstacle in the government's battle against drugs.

The evidence presented demonstrated that Debbie Williams was present in Colorado Springs when her husband paid Marlow $22,000. She saw her husband pay $10,000 to Riley, another drug supplier, in New Orleans. Debbie witnessed her husband pay over $25,000 to Rodney Shaddy, another drug dealer, in Custer, South Da-

kota. The evidence showed that Debbie kept the telephone numbers of drug dealers in her purse and that she relayed a drug supplier's message to her husband. Debbie also helped convey Marlow's children back to Indiana, enabling co-conspirator Marlow to travel unencumbered to Las Vegas and consummate another drug deal. Debbie carried large sums of cash in her purse even though neither she nor her husband were employed. Large amounts of cash and drugs were concealed in the Williams' residence. Finally, Debbie and her unemployed husband used the profits of their drug sales to support their lifestyle and finance their trips. It is settled law that "[o]nce the Government proves the existence of a conspiracy, the Government need only offer 'slight evidence to prove that an individual was a member of the conspiracy.'" *United States v. Gironda*, 758 F.2d 1201, 1217 (7th Cir.1985). It is obvious that there is far more than slight evidence that Debbie Williams participated in the conspiracy. Indeed, the circumstantial evidence is overwhelming that Debbie Williams took part in a conspiracy to distribute methamphetamine. Circumstantial evidence is "intrinsically as probative as direct evidence," *United States v. Taylor*, 599 F.2d 832, 838 (8th Cir.1979). Circumstantial evidence "may be the sole support for a conviction." *United States v. McCrady*, 774 F.2d 868, 874 (8th Cir.1985). Because of the substantial amount of evidence against Debbie Williams, I must dissent.

I also dissent because the government established more than a sufficient basis for the admission of David Williams' statement at the *Santiago* hearing that Debbie "counted the money." Debbie Williams concedes that the government established that her husband David was a member of the conspiracy charged, and does not deny that she had knowledge of the conspiracy. The government was only required to produce "slight evidence" that Debbie was a member of the conspiracy in order to support Debbie's conviction. I believe the government produced substantially more than "slight evidence" that Debbie Williams actively participated in the conspiracy and accordingly I agree with the decision of the trial court and I would affirm her conviction.